### THE GULF OF MEXICO. THE CORNING. THE KIRKCUDBRIGHTSHIRE.

(Circuit Court of Appeals, Second Circuit. March 13, 1922.)

Nos. 144–147.

1. **Collision ⬤⟶73—Steamship colliding with anchored vessel presumptively at fault.**

   A steamship, coming into collision with an anchored vessel, is presumptively at fault.

2. **Collision ⬤⟶69, 73—Vessels in motion required to keep out of way of vessels at anchor, and have burden of showing themselves free from fault.**

   Vessels in motion are required to keep out of the way of vessels at anchor, and the latter are without fault, unless it appears that the collision was the result of unavoidable accident, and, if the latter, the rule is that a vessel in motion must exonerate herself from blame by showing that it was not within her power to prevent the collision by adopting any practical precaution.

3. **Collision ⬤⟶71(2)—Vessel colliding with anchored vessels in ice floe in the narrows held at fault.**

   A steamship, weighing anchor on the ebb tide and coming in contact with ice floe, without full head of steam or proper lookout, in the Narrows, and colliding with anchored vessels, *held* to have failed to prove unavoidable accident, so as to overcome the presumption as to fault.

4. **Collision ⬤⟶71(3)—Anchored vessel held not at fault in collision.**

   An anchored steamer, which was struck by steamship in the Narrows, *held* not at fault for having failed to veer her chain.

5. **Collision ⬤⟶71(2)—Steamer, fouling anchored vessel, held liable for collisions caused between other vessels.**

   A steamer, which was at fault in a collision with an anchored vessel in the Narrows, was liable for injuries to other anchored vessels, caused by the breaking of the anchor chain of the first vessel, which drifted down on the ebb tide and fouled the others.

Appeals from the District Court of the United States for the Southern District of New York.

Libels in admiralty by the Grace Steamship Company against the steamship Gulf of Mexico, the Gulf Refining Company, claimant, and the steamship Corning, the Standard Oil Company of New Jersey, claimant; by the French Overseas Corporation against the steamship Gulf of Mexico, the Gulf Refining Company, claimant, the schooner Kirkcudbrightshire, Thomas Law & Co., claimant, and the steamship Corning, the Standard Oil Company, claimant; by Thomas Law & Co. against the steamship Corning, the Standard Oil Company of New Jersey, claimant, and the steamship Gulf of Mexico, the Gulf Refining Company, claimant; and by the Gulf Refining Company against the steamship Corning, the Standard Oil Company of New Jersey, claimant. From decrees in favor of libelants, the steamship Corning and its owner appeal. Affirmed.

---

⬤⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City (Robert S. Erskine, of New York City, of counsel), for appellant.

Harrington, Bigham & Englar, of New York City (C. Andrade, Jr., of New York City, of counsel), for appellees Grace S. S. Co. and French Overseas Corporation.

Burlingham, Veeder, Masten & Fearey, of New York City (Chauncey I. Clark and Charles E. Wythe, both of New York City, of counsel), for appellee Gulf of Mexico.

Haight, Smith, Griffin & Deming, of New York City (James McKown, Jr., of New York City, of counsel), for appellee Thomas Law & Co.

Before ROGERS and MANTON, Circuit Judges, and AUGUSTUS N. HAND, District Judge.

MANTON, Circuit Judge. These four suits were heard together, and considered in one opinion below, and we shall deal with them here in one opinion.

On January 31, 1918, the steamship Corning was at anchor on the anchorage grounds off Staten Island. She left her anchor about 3 or 4 o'clock in the morning, and while turning to pass down through the Narrows, out to sea, encountered ice which, she says, diminished her headway and made her unmanageable. She swept downstream somewhat broadside, until her starboard quarter fouled the bow of the ship Gulf of Mexico. This was a loaded tank steamship, which had been allowed to anchor some distance astern of the Corning. Ahead of the Corning and on her starboard bow, some 400 feet, lay a schooner, and abreast of the schooner, to the east, lay a sailing ship, both at anchor. The Charles Pratt was anchored abreast of the Mexico on her starboard side, between 600 and 800 feet away. Astern of the Mexico was the Santa Paula (libelant Grace Steamship Company's vessel). The schooner Kirkcudbrightshire was owned by the appellee Thomas Law & Co., and the schooner Malcolm Baxter, Jr., was owned by the libelant French Overseas Corporation. The latter was anchored off to the Santa Paula's port quarter; the Kirkcudbrightshire being somewhat ahead of the Baxter, which was further to port. The weather was clear; the wind light and northwest. The tide was ebb, running about 1½ to 2 knots. It was the intention of the master of the Corning to proceed across the bows of the Mexico and the Pratt and into the channel.

The officer of the Mexico observed the masthead light and green light of the Corning some 700 to 1,000 feet away, proceeding on a course to pass safely. There was no danger of collision imminent, or such as to cause apprehension. The third officer left the deck in charge of the quartermaster, who was on watch, going in temporarily, and when he returned he observed the Corning about 100 feet away on a course to cross the Mexico's bow from port to starboard. He ran forward with the quartermaster to pay out anchor chain, but not in time to avoid the collision. When the vessels struck, the Corning's starboard quarter struck the Mexico's bow, shoving her stem from port to starboard. The Corning continued on scraping the Mexico's bow

until her stern got about 100 feet off the Mexico's starboard bow, when the Corning found herself in danger of collision with the Pratt. She dropped her anchor and put her engines full speed astern, backing into collision with the Mexico a second time, and this time parting the Mexico's starboard anchor chain and breaking her adrift. The Corning then put her engines ahead and cleared the Mexico, but in coming to anchor collided with the Pratt.

After this second collision, the Mexico's port anchor was let go and the chain paid out slowly, in order to bring her up. Orders were given to the Mexico's engine room to get her engines ready, but before this could be done the Mexico dragged down into collision with the Santa Paula. The Mexico's stern was against the Santa Paula's right port bow. The Mexico could not use her engines, because the situation was dangerous, and it was impossible for the Santa Paula to let go her port anchor. The Mexico continued paying out chain, both vessels dragging under the influence of the strong ebb tide, and the Mexico's port side struck up against the bow of the Kirkcudbrightshire and Baxter, Jr. At slack tide, tugs were obtained and the Mexico was pulled adrift from the other vessels. Large awards have been made for these damages against the Corning. She has been held solely at fault. She seeks to escape this liability, contending that the ice floe was primarily the cause of the series of collisions, and that this excuses her. Appellant further contends that the Mexico and Santa Paula failed to cooperate in avoiding the collision or mitigating the damages, and are, at least partly, at fault.

[1, 2] The Corning came into collision with an anchored vessel, and is presumptively at fault. It was a clear night, and there is no claim of a foul berth. Vessels in motion are required to keep out of the way of vessels at anchor, and the latter are without fault, unless it appears that the collision was the result of unavoidable accident. If the latter, the rule is that a vessel in motion must exonerate herself from blame by showing that it was not within her power to prevent the collision by adopting any practical precautions. The Virginia Ehrman v. Agnese, 97 U. S. 309, 24 L. Ed. 890; Granite State, 70 U. S. (3 Wall.) 310, 18 L. Ed. 179; The Bridgeport, 81 U. S. (14 Wall.) 116, 20 L. Ed. 787.

[3] When the Corning started on her voyage, it was necessary to pull up on her anchor chain, bringing herself within a short distance, about 150 feet, from the stern of the two sailing vessels anchored to the northward of her. To clear these vessels, she dropped back and then put her engines ahead under a hard aport helm, in order to swing clear and pass through the sterns of the sailing vessels, the Mexico and the Pratt, anchored to southward. There was plenty of navigable water between these sailing vessels, but the Corning seeks to be excused because of a heavy floe of ice which she encountered, which caught her on her port side. The testimony of her third assistant engineer and the entry in the engine scrap log show that the engines were not full of speed ahead for more than four minutes. They were put full speed astern about 3:44, one minute before the collision with the Mexico, which occurred at 3:45. To overcome this ice, it was essential that the engines be kept

full speed ahead. It appears that her engines were put full speed astern at the very moment when they should have been kept full speed ahead.

This was not adopting the precaution which practical navigation dictated. Further than this, it appears that she did not carry a lookout at the time. To leave the anchorage grounds, passing between the Mexico and the Pratt, was not an improper maneuver. The ebb tide was strong, but its influence could have been overcome, if proper allowances had been made for it. The Corning could have dropped back a little with the tide to give her more room, and then proceeded ahead, angling against the tide, which was continuously setting her down, heading to pass close astern of the sailing ships to the northward and eastward of her. When entirely clear, her helm hard aport, she could have swung around and gone down the channel. This would carry her to the northward of both the Mexico and the Pratt. Therefore what she did brought about disaster. After her anchor was hove up, she fell back to clear the vessels ahead; but, instead of angling into the tide to give a wide clearance to the vessels astern, she kept under the port helm, broadside to the tide, which swept her down onto the Mexico. Then, when collision was unavoidable, she shipped the helm hard to starboard and tried to shape her into the current. But she would not answer the helm. If she had shaped into the current sooner, she would have done so safely. Then to starboard her helm at the eleventh hour placed her in a worse situation. This had the effect of throwing her astern to starboard and against the bow of the Mexico.

The pilot's testimony is not in accord with this. He says he went astern of the Corning to clear the vessels on her bow, then came ahead and ported to clear his ship's stern and steady her up after she cleared. She passed the stern of the sailing ship a distance of 200 feet, going up to the northward, and that the helm was kept starboard up to the collision, and that the ice floe did not strike the Corning until she was clear of the sailing ship; but in either case there was no reason why the Corning should not have avoided the collision which occurred. The pilot's explanation totally fails to account for the collision. After striking the bow of the Mexico with her starboard quarter, the Corning continued moving ahead and found herself bearing down on the Pratt anchored abreast of the Mexico, some 500 to 800 feet to the eastward, and in order to check her headway and avoid collision with the Pratt, she let go her port anchor and, putting her engines full speed astern, acquired considerable sternway, and came into collision with the Mexico a second time, with sufficient force to break the latter vessel adrift. For this the Corning is likewise at fault.

It is conceded that the Corning had no lookout. Considering the severity of the weather, the likelihood of ice floes being in the vicinity, prudent navigation should have indicated to the pilot of the Corning the necessity of having one on watch so as to report ice floes. Neither the chief engineer nor the boatswain were on the forecastle head after moving up the port anchor. Neither could act as lookouts, for they were engaged in making it fast, and no one was stationed for that purpose. Under these circumstances, we think the Corning was guilty of fault in failing to have a lookout properly stationed. The Coamo (C.

C. A.) 267 Fed. 686; The J. W. Wonson, 239 Fed. 857, 153 C. C. A. 3;
D., L. & W. v. Central R. of N. J., 238 Fed. 560, 151 C. C. A. 496.

After the first collision with the Mexico, the Corning should have dropped her anchor. The port anchor had just been hoved up and the chief officer and boatswain were engaged in stowing it. They may have let it go a few seconds and that, together with the Corning's engine, would undoubtedly have obtained control of the vessel. This safeguard was not resorted to or attempted until after the collision with the Mexico and the Corning was about to collide with the Pratt. The anchor was successfully used to avoid collision with the Pratt, and it is a fair assumption to say, that, if it had been used before the second collision, it would have been equally as efficient in avoiding the collision with the Mexico.

We also think the Corning was clearly at fault for starting out, under the prevailing ice conditions, without a full head of steam. The evidence preponderates in support of the claim that the Corning did not have a full head of steam. The chief engineer and first assistant were not examined, nor was the engine log produced, and the failure to do so weakens very materially the Corning's case. No satisfactory explanation is offered for their and its nonproduction. These conditions make it plain that the Corning is not excused from collisions on the theory of inevitable accident. We think the Corning has failed to point out and prove inevitable accident. Her navigation and faults above referred to point to negligence on her part. In re Reichert Towing Line, 251 Fed. 214, 163 C. C. A. 370.

[4] Nor do we think the Mexico may be charged with fault and therefore share in sustaining damages. It is charged that the Mexico was at fault, in that she did not veer her chain, and because the third officer of the Mexico was absent from the deck. The claim of the appellant that the Mexico could have avoided the collision by veering her chain, is based upon the fact that in each instance the respective vessels failed to clear one another by slight margins. That accident or incident cannot aid the Corning. If anything, it may be urged that the Mexico had less reason for alarm until the last moment. The Mexico had a lookout on the bridge who was attentive to his duties and was at anchor. There was nothing that required a particularly alert lookout. There was ample room, if the Corning was properly handled, to get out of the anchorage without risk of collision with other vessels. The authorities are numerous where, under similar circumstances, anchored vessels had been relieved of liability. Lind v. Penn., 139 Fed. 233, 71 C. C. A. 359; The Beaverton (D. C.) 273 Fed. 539; The Lady Franklin, 2 Low. 220, Fed. Cas. No. 7984; The Ceylon Maru (D. C.) 266 Fed. 396; The Pocahontas, 235 Fed. 116, 148 C. C. A. 610.

[5] As to the second collision, it is contended that the Mexico should have paid out chain, so that the Corning could back across her stem; but nobody could be charged with reasonably expecting, after the Corning had once collided with the Mexico, that she would put her engines full speed astern and back into collision with her again. After the second collision, it was discovered that the Mexico's anchor chain had been broken and the ship sent adrift. Then the port anchor was let go at

281 F.—6

once, and efforts were made to check the Mexico.. About 35 fathoms of chain had been paid out and the Mexico continued dragging astern. The officers in charge did everything reasonably to be expected to avoid a collision with the Santa Paula, but when the chain was checked, the Mexico had about 45 fathoms out. There was no opportunity to use her engines. There was steam, but it would have taken about 10 minutes before the engines could be turned over and the time between the second collision with the Corning and that with the Santa Paula was estimated at about 5 minutes, during the time the Mexico was falling down with the tide. The port anchor could not, under these circumstances, have been let go immediately.

It cannot now be disputed that reasonably safe navigation indicated the necessity of paying out slowly and checking the Mexico as she went, using the anchor as a drag to check the weight until sufficient chain was out for the anchor to hold. The force of the collision with the Corning pushed the bow of the Mexico off to port, and she came down angling, instead of stemming the tide. Then the Mexico fetched up on the Santa Paula's bow and the latter dragged with her and the Mexico swung around on the Santa Paula, her stern sliding down the Santa Paula's port side until it reached a point almost abreast of the bridge. A line was run from the stern of the Mexico to the side of the Santa Paula to check her and to minimize the damage. It would not have been advisable for either ship at this time to use its engines, for to do so, while thus locked together and dragging, would have caused .more damage. It was while thus interlocked, and before they could clear one another, that the Mexico sagged down against the Kirkcudbrightshire, which vessel fouled the funnel and rigging of the Mexico with her jib boom, and while they were all thus together, the three sagged down on the Baxter, whose headgear got afoul of the Mexico and caused further damage. The direct and proximate cause of this series of collisions was the fault of the Corning. There were no intervening causes which in any degree assisted in the original faults of the Corning. Therefore the direct and proximate cause of the collisions to the various vessels and the resulting damages flow from the Corning's faults, and she alone should be held liable. Her faults were adequate in themselves to account for all the collisions. They are sufficient to account for each resulting disaster, and if there were any reasonable doubt, it could, with propriety, be resolved against the Corning. City of N. Y., 147 U. S. 72, 13 Sup. Ct. 211, 37 L. Ed. 84; The Oregon, 158 U. S. 186, 15 Sup. Ct. 804, 39 L. Ed. 943.

We see no error in the result below. The decrees are affirmed.